[No. 23531-1-I. Division One. December 13, 1990.]

THE STATE OF WASHINGTON, *Respondent,* v. PEDRO MANUEL BACOTGARCIA, *Appellant.*

*Rita J. Griffith* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Peter Goldman, Deputy,* for respondent.

FORREST, J.—Pedro Manuel Bacot Garcia[1] appeals from his conviction by a jury of promoting prostitution in the first degree and rape in the second degree. We affirm.

Bacot Garcia was charged by information on June 9, 1988, with promoting prostitution in the first degree and with rape in the second degree. Sherrie Curry testified that she met the defendant in Pike Place Market on March 22, 1988. She was 15 years old. They walked to the waterfront

---

[1]Although charged as Bacotgarcia, the defendant states his name to be Bacot Garcia.

and smoked cocaine together, but the defendant refused to accept money for the drugs. Curry then accepted a ride from Bacot Garcia, who claimed he needed to stop at an apartment in the University District. Upon arriving at the apartment, Curry and the defendant smoked more cocaine.

Curry stated that the defendant eventually began touching her and insisted that she take her clothes off. She refused and said she had to leave. Bacot Garcia grabbed her by the arm, began taking her clothes off, slapped her six or seven times while she resisted, and had sexual intercourse with her. Afterward, the defendant refused to let Curry go. He left the apartment, but Curry could not get out since the door was locked from the outside. She did not use the telephone to call for help because a woman was in the bedroom where it was located. She did not pound on the walls to attract attention, nor did she report the rape to the police or a medical clinic despite opportunities.

The next day, Bacot Garcia gave Curry more crack cocaine. He took her to a motel in Tacoma. The defendant told Curry he had a "date" for her. Curry refused to prostitute herself. The defendant struck her and told her she owed him for the drugs. She had sex with the defendant's customer, who paid Bacot Garcia $150.

Curry testified that she worked as a prostitute for the defendant during the next 3 months. She had as many as eight or nine customers in a typical day. Bacot Garcia taught her how to avoid arrest, how much to charge, and hit her when she was uncooperative. Among the locations she worked were the Bush Hotel and the area on Pike Street immediately east of the Washington Convention Center. Curry gave the money she earned to Bacot Garcia. He continued to supply her with cocaine.

Curry and Michael Gaines, who "supervised" her for the defendant, were arrested on April 26, 1988. After her release from the King County Juvenile Detention Center, Curry began working for Bacot Garcia again. After her arrest on May 4, 1988, Curry reported the rape and pointed

out the apartment where it had occurred. The defendant was investigated and charged.

When trial began, the State moved to admit the testimony of Krystina Brackett, with whom Bacot Garcia had a pimp–prostitute relationship 2 years earlier. The court heard her offer of proof and admitted the evidence under ER 404(b), ruling that it showed a common plan or scheme. Brackett testified that she met the defendant in 1985 when she was 15. He gave her drugs and she had sex with him. Bacot Garcia supplied her with drugs during the next 6 months. He eventually asked her to have sex with a "date" and she complied. Thereafter, the defendant demanded that Brackett begin prostituting herself to repay him for what he had given her. He kept the money customers paid. She worked, among other places, in the Bush Hotel and immediately east of the Washington Convention Center. Bacot Garcia would hit her when she was uncooperative. Michael Gaines "supervised" her.

During his testimony, Bacot Garcia admitted knowing Brackett but denied ever promoting her as a prostitute. He denied ever acting as a pimp. He stated that he had paid Sherrie Curry to "put my testicles in her mouth" and did not rape her. He denied ever taking her to the University District or to Tacoma. He denied knowing Michael Gaines. On cross examination, he said Curry and Officer Abraham, who had testified that he had seen Bacot Garcia at First and Pike Streets with Curry, were lying.[2] In closing argument, the prosecutor suggested Bacot Garcia was lying to protect himself.[3]

---

[2] "Q. Now, you say Sherrie Curry is lying about you, is that true?
"A. Yes.
"Q. And Officer Abraham is lying about you as well in court, is that true?
"A. On the life of my mother, yes."

[3] "[B]ut I suggest, Ladies and Gentlemen, that the evidence in this case shows Pedro Bacotgarcia is a liar. He lied to you about why Krystina Brackett would want to testify against him. . . . When you consider the credibility of the witnesses, recognize there are two sides here as defense counsel promised you and one side, frankly, Ladies and Gentlemen of the jury, as the evidence shows it [is] a

The defendant was found guilty on both counts as charged. This appeal followed.

## ER 404(b) Issue

Bacot Garcia contends that the trial court erred upon permitting Krystina Brackett, who allegedly had once acted as his prostitute, to testify as to the defendant's other bad acts, claiming such evidence is prohibited under ER 404(b).[4]

■ The admissibility of evidence under ER 404(b) is to be determined in conjunction with ER 402 and 403. Hence, to be admitted, evidence of other crimes, wrongs, or acts must meet two criteria: (1) it must be relevant and necessary to prove an essential ingredient of the crime charged; and (2) its probative value must outweigh its potential for prejudice.[5] The court must identify the purpose for which the evidence is to be admitted. This analysis must be on the record.[6] Evidence of other criminal activity must be established by a preponderance of the evidence.[7] If such evidence is admitted, the court must explain its purpose to the jury. These steps are particularly important in "sex cases".[8]

---

pack of lies and the pack of lies is designed to protect the interest of Pedro Bacotgarcia."

[4]ER 404(b) provides:
"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

[5]*State v. Saltarelli*, 98 Wn.2d 358, 361–62, 655 P.2d 697 (1982).

[6]*State v. Smith*, 106 Wn.2d 772, 776, 725 P.2d 951 (1986); *State v. Jackson*, 102 Wn.2d 689, 694, 689 P.2d 76 (1984).

[7]*State v. Tharp*, 96 Wn.2d 591, 594, 637 P.2d 961 (1981); *State v. Castro*, 32 Wn. App. 559, 563, 648 P.2d 485, *review denied*, 98 Wn.2d 1007 (1982).

[8]*Saltarelli*, at 362–63; *State v. Coe*, 101 Wn.2d 772, 780–81, 684 P.2d 668 (1984).

■ The trial court admitted Brackett's testimony, explaining that the relationships Bacot Garcia had with Curry and Brackett evinced a common scheme or plan. To prove a common plan, the proponent of the evidence must demonstrate a specific prior design or system which included committing the act charged.[9] As Wigmore explained, common plans must share "*such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.*" 2 J. Wigmore, *Evidence* § 304, at 249 (1979). Evidence of a common plan or scheme is also admitted "[t]o complete the story of the crime on trial by proving its immediate context of happenings near in time and place." (Footnote omitted.) C. McCormick, *Evidence* § 157, at 328 (1954).[10]

A mere "general similarity" between the other offenses and the crime charged is insufficient to show a plan to commit the offense charged.[11] Indeed, as stated in *State v. Goebel,* 40 Wn.2d 18, 21, 240 P.2d 251 (1952):

> The only purpose of showing a common scheme or plan is to establish, circumstantially, the commission of the act charged and the intent with which it was committed. . . . Strictly speaking, the scope of this exception is limited to evidence which shows some causal connection between the two offenses, so that proof of the other offense could be said to evidence a *pre–existing design,* system, plan, or scheme directed toward the doing of the very act charged.

[9]*State v. Bennett,* 36 Wn. App. 176, 180, 672 P.2d 772 (1983).

[10]*See* 2 J. Weinstein & M. Berger, *Evidence* ¶ 404[16] (1989); *State v. Tharp,* 96 Wn.2d 591, 594, 637 P.2d 961 (1981), where the court wrote:

"In this instance, the uncharged crimes were an unbroken sequence of incidents tied to Tharp, all of which were necessary to be placed before the jury in order that it have the entire story of what transpired on that particular evening. Each crime was a link in the chain leading up to the murder and the flight therefrom. Each offense was a piece in the mosaic necessarily admitted in order that a complete picture be depicted for the jury."

[11]*State v. York,* 50 Wn. App. 446, 455, 749 P.2d 683 (1987), *review denied,* 110 Wn.2d 1009 (1988); *State v. Harris,* 36 Wn. App. 746, 750, 677 P.2d 202 (1984).

(Italics ours.)[12]

Here, the trial court permitted Brackett's testimony because of the similarities between the method used by Bacot Garcia with Brackett and Curry.[13] Additionally, the court stated that the essential element being shown was the defendant's knowledge he was promoting prostitution.

It is difficult to comprehend why the defendant's knowledge of promoting prostitution was an "essential ingredient" of the crime charged since the mere fact that such a crime had been committed would establish knowledge. Further, the nature and time of Bacot Garcia's relationship with Brackett differs significantly from his relationship with Curry. Brackett and the defendant had a strictly romantic relationship for the first 6 months they dated; Curry became a prostitute for Bacot Garcia immediately after meeting him. He did not hit Brackett for the first 6 months; he used violence against Curry immediately. There is a gap of at least 1 year between the end of his relationship with Brackett and his first contact with Curry.

---

[12]As Wigmore warned:

"Many cases, however, do not limit the evidence to a plan to do the specific act charged. This is pointed out in a perceptive opinion by Hamley, J., in State v. Goebel, 40 Wash. 2d 18, 240 P.2d 251 (1952), quoted in §357 n. 1, *infra*. Without the limitation, the theory may be the vehicle for a violation of the character rule. Thus, the court in State v. Spreigl, 272 Minn. 488, 493, 139 N.W.2d 167, 170 (1965), observes that use of the theory comes 'perilously close to putting the defendant's character . . . in issue.'" 2 J. Wigmore, *supra*, at 249 n.1.

[13]As the court stated:

"Is there a scheme, design or plan? It appears that there may well be, if the jury were to accept the testimony as such, and that is some design, some scheme or plan to get young females to perform acts of prostitution so that the defendant could profit therefrom by, first, being nice to a young female; second, giving her drugs or other things; third, to get the young female indebted to him; fourth, to force or compel or to assist her in performing acts of prostitution to earn money to repay him; fifth, the probable use of Michael Gaines to, quote, 'watch or be a watchdog,' end of quote, of the young girl; and, sixth, on one occasion, at least, in regards to the two girls, using Michael Gaines to promote the prostitution of each of the girls.

"And all of these factors which the Court has referred to may also prove the knowledge of the defendant in regards to how the money was earned."

The nature of Bacot Garcia's relationship with Brackett does not of itself evince any preexisting plan to promote prostitution which would include the offense for which the defendant was convicted. Nor does proof of the defendant's relationship with Brackett establish a preexisting plan. The evidence admitted by the court merely permits the inference of a common plan from the similarity between the relationships with Brackett and Curry. This inference would be far more compelling with evidence of additional such relationships. It is plausible that the defendant merely exploited unexpected opportunities to establish relationships with Brackett and Curry which now appear similar, rather than pursuing a preexisting plan.[14] There is a crucial difference between committing two separate crimes in a similar manner as compared to engaging in a common plan to commit both crimes.

ER 404(b) distinguishes between evidence offered to prove the defendant's bad character and that offered to prove a common plan. Under the rule, it is impermissible to use evidence of other crimes or wrongs to prove that a person acted in conformity with his bad character. Evidence of a defendant's prior crime or wrong is permitted, however, to prove the existence of a common plan which encompasses the two or more crimes, thus making it more probable he committed the charged crime. A juror's natural inclination is to reason that having previously committed a crime, the accused is likely to have reoffended. Of course, this inclination is more likely if the crimes are similar. ER 404 is intended to prevent application by jurors of the common assumption that "since he did it once, he did it again."

In the case before us, it is very dubious whether the jury was able to evaluate Krystina Brackett's testimony without applying this erroneous assumption prohibited under ER 404(b). The court's instruction did not explain the limits of the "common plan" exception and might have permitted a

---

[14]*See State v. Bowen*, 48 Wn. App. 187, 738 P.2d 316 (1987).

misapplication of the evidence.[15] On these facts, it appears that the "plan" exception defeats the larger purpose of the rule.

Cases in which the defendant denies committing the crime are similar to cases in which the State seeks to prove the defendant's identity as to the crime charged by using his identity proved as to a prior crime. In both instances, the defendant is linked to the charged crime due to its similarity to a previous crime committed by the accused. Under ER 404(b), evidence showing identity is admissible only when the method used in the "signature" crimes was so unique that "mere proof that an accused committed one of them creates high probability that he also committed the act charged." *State v. Smith,* 106 Wn.2d 772, 777, 725 P.2d 951 (1986) (quoting *State v. Laureano,* 101 Wn.2d 745, 764, 682 P.2d 889 (1984)). Here, the evidence of Bacot Garcia's relationship with Brackett plainly would not have been admissible under ER 404(b) to show identity. In our view, to establish a common plan through similarity between the charged crime and a prior crime, courts should rarely, if ever, admit evidence of a prior crime which does not qualify as a "signature crime" without other clear evidence of the common plan.

We find use of ER 404(b) to admit Brackett's testimony to be questionable.[16] In *State v. Bowen,*[17] for instance, a physician was charged with indecent liberties after placing

---

[15]Instruction 17A reads:

"Testimony has been received from Krystina Brackett. Such evidence was not admitted and may not be considered by you as proof that the defendant is a person of bad character or as proof that the defendant had a predisposition to commit the crimes for which he is on trial.

"This evidence was admitted and may be considered by you only insofar as you find it tends to establish the elements of the particular crimes charged."

[16]The risk of unfair prejudice to Bacot Garcia is manifest: when the defendant was first tried, the jury did not hear Brackett's testimony and was hung. During the trial from which this appeal was taken, Brackett's testimony was allowed and Bacot Garcia was convicted.

[17]48 Wn. App. 187, 738 P.2d 316 (1987).

his hands under a patient's clothes upon examining her in her home. The physician denied any improper touching. Two other patients of the physician testified that the doctor had behaved identically with them. The defendant knew that all three women were separated from their husbands. The *Bowen* court rejected the State's argument that the two prior incidents and the charged incident evinced a common plan or scheme under ER 404(b).

However, evidence has been admitted by the Washington courts on quite similar facts relying on the common plan exception. In *State v. Bennett*,[18] for example, the defendant provided food, shelter, and medical care to victims in exchange for sexual intercourse. The trial court admitted the testimony of two other witnesses who testified that the defendant offered them money or food and shelter in return for sex. The Court of Appeals affirmed. It noted that the common plan exception required showing other similar acts with common features which would tend to demonstrate that the acts charged had been committed. The court held that the witnesses' testimony showed a plan which made sexual intercourse with the victims more likely. Other cases have employed similar reasoning.[19]

ER 404(b) rulings are reviewed for an abuse of discretion.[20] Clearly, the trial court could have properly excluded the evidence, but we are unable to say that the trial court

---

[18] 36 Wn. App. 176, 672 P.2d 772 (1983).

[19] *See State v. Hardy*, 37 Wn. App. 463, 681 P.2d 852 (defendant's encounter with a plainclothes police officer, during which he offered to sell drugs and instructed the officer that he would have to accompany him to get the drugs, and the defendant's encounter with his robbery victim, were similar enough to constitute a common plan, justifying admission of the officer's testimony under ER 404(b)), *review denied*, 102 Wn.2d 1001 (1984); *State v. York*, 50 Wn. App. 446, 749 P.2d 683 (1987) (court approved admission of evidence of common plan under ER 404(b) where the defendant accosted victims within a relatively close proximity in time, who were similar in age, were performing similar duties as students, and were in the same general area), *review denied*, 110 Wn.2d 1009 (1988).

[20] *State v. Bennett*, 36 Wn. App. 176, 672 P.2d 772 (1983); *State v. Goebel*, 40 Wn.2d 18, 240 P.2d 251 (1952).

abused its discretion in admitting it, in light of *Bennett, Hardy,* and *York.*

Affirmed.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

SCHOLFIELD and WEBSTER, JJ., concur.

Review denied at 116 Wn.2d 1020 (1991).